(Slip Opinion)

# Licensing Marijuana Cultivation in Compliance with the Single Convention on Narcotic Drugs

Under the Controlled Substances Act, the Drug Enforcement Administration may register an applicant to cultivate marijuana only if the registration scheme is consistent with the Single Convention on Narcotic Drugs. To comply with the Single Convention, DEA's licensing framework must provide for a system in which DEA or its legal agent has physical possession and ownership over the cultivated marijuana and assumes control of the distribution of marijuana no later than four months after harvesting.

June 6, 2018

MEMORANDUM OPINION FOR THE ACTING CHIEF COUNSEL
DRUG ENFORCEMENT ADMINISTRATION

Under the Controlled Substances Act, the Attorney General is authorized to license marijuana cultivation if he determines that it would be "consistent with the public interest and with United States obligations under international treaties, conventions, or protocols in effect on May 1, 1971." 21 U.S.C. § 823(a). Such obligations include those under the Single Convention on Narcotic Drugs ("Single Convention"), Mar. 30, 1961, 18 U.S.T. 1407. As relevant here, the Single Convention requires parties either to prohibit marijuana cultivation altogether or, if they permit cultivation, to establish "a single government agency" to oversee marijuana growers and generally to monopolize the wholesale trade in the marijuana crop. *Id.* arts. 22, 23(3), 28(1). That single agency must strictly regulate any lawful cultivation of marijuana by, among other things, "purchas[ing] and tak[ing] physical possession of [the] crops as soon as possible, but not later than four months after the end of the harvest." *Id.* art. 23(2)(d).

This opinion considers whether the Drug Enforcement Administration ("DEA"), which exercises the Attorney General's licensing authority, must alter existing licensing practices to comply with the Single Convention. At present, DEA does not purchase or take physical possession of lawfully grown marijuana at any point in the distribution process. Instead, the only currently licensed marijuana cultivator grows and distributes the marijuana itself pursuant to a contract with, and under the supervision of, the National Institute on Drug Abuse ("NIDA"), a component of the Department of Health and Human Services' National Institutes of Health. In 2016, DEA revised this process and announced that it would increase the number of licensees and supervise the additional growers itself.

1

*See* Applications To Become Registered Under the Controlled Substances Act To Manufacture Marijuana To Supply Researchers in the United States, 81 Fed. Reg. 53,846, 53,848 (Aug. 12, 2016) ("Applications To Manufacture Marijuana"). Under the new policy, DEA would not purchase or possess the marijuana before licensees distributed it to government-approved researchers. Several entities have applied for licenses under the new policy, but no applications have been approved.

We conclude that DEA must change its current practices and the policy it announced in 2016 to comply with the Single Convention. DEA must adopt a framework in which it purchases and takes possession of the entire marijuana crop of each licensee after the crop is harvested. In addition, DEA must generally monopolize the import, export, wholesale trade, and stock maintenance of lawfully grown marijuana.[1] There may well be more than one way to satisfy those obligations under the Single Convention, but the federal government may not license the cultivation of marijuana without complying with the minimum requirements of that agreement.

## I.

The Single Convention entered into force for the United States on June 24, 1967, after the Senate had given its advice and consent to the United States' accession. *See* Single Convention, 18 U.S.T. 1407. The Convention requires parties to impose stringent controls on the cultivation, manufacture, and distribution of narcotic drugs, including "cannabis," which it defines as "the flowering or fruiting tops of the cannabis plant (excluding the seeds and leaves when not accompanied by the tops) from which the

---

[1] In preparing this opinion, we considered the views of DEA, the Office of the General Counsel of the Department of Health and Human Services, and the Department of State's Office of the Legal Adviser. *See* Applications To Manufacture Marijuana, 81 Fed. Reg. at 53,846–48 (discussing requirements of the Single Convention applicable to licensing marijuana cultivation); Lyle E. Craker, PhD, 76 Fed. Reg. 51,403, 51,409–11 (DEA Aug. 18, 2011) (same); Lyle E. Craker, 74 Fed. Reg. 2101, 2114–18 (DEA Jan. 14, 2009) (same); Memorandum for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Matthew S. Bowman, Deputy General Counsel, Department of Health and Human Services (Apr. 13, 2018) ("HHS Mem."); Office of Law Enforcement and Intelligence and Office of Treaty Affairs, *Single Convention Analysis* (Jan. 29, 2018) ("State Mem."); Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Jennifer G. Newstead, Legal Adviser, Department of State (Apr. 17, 2018) ("State Supp. Mem.").

resin has not been extracted, by whatever name they may be designated." Single Convention art. 1(1)(b). Parties must, among other things, establish quotas on the import and manufacture of cannabis, generally prohibit the possession of cannabis, and adopt penal provisions making violations of those controls punishable offenses. *Id*. arts. 21, 33, 36.

Article 28 of the Single Convention requires that any lawful cultivation of the cannabis plant be subject to the same system of strict controls "as provided in article 23 respecting the control of the opium poppy." *Id*. art. 28. The cross-referenced provisions in Article 23 provide as follows:

1. A Party that permits the cultivation of the opium poppy for the production of opium shall establish, if it has not already done so, and maintain, one or more government agencies (hereafter in this article referred to as the Agency) to carry out the functions required under this article.

2. Each such Party shall apply the following provisions to the cultivation of the opium poppy for the production of opium and to opium:

   a. The Agency shall designate the area in which, and the plots of land on which, cultivation of the opium poppy for the purpose of producing opium shall be permitted.

   b. Only cultivators licensed by the Agency shall be authorized to engage in such cultivation.

   c. Each license shall specify the extent of the land on which the cultivation is permitted.

   d. All cultivators of the opium poppy shall be required to deliver their total crops of opium to the Agency. The Agency shall purchase and take physical possession of such crops as soon as possible, but not later than four months after the end of the harvest.

   e. The agency shall, in respect of opium, have the exclusive right of importing, exporting, wholesale trading and maintaining stocks other than those held by manufacturers of opium alkaloids, medicinal opium, or opium preparations. Parties need not extend this exclusive right to medicinal opium and opium preparations.

3. The governmental functions referred to in paragraph 2 shall be discharged by a single government agency if the constitution of the Party concerned permits it.

The agency's "exclusive right[s]" over the harvested marijuana need not extend to "medicinal" marijuana or marijuana "preparations," but the national cannabis agency must still purchase and take physical possession of all marijuana grown for such purposes. *Id*. art. 23(2)(d)(e); *see* Report of the International Narcotics Control Board for 2014, at 35 (Mar. 3, 2015) ("2014 INCB Report"); Secretary-General of the United Nations, *Commentary on the Single Convention on Narcotic Drugs, 1961*, at 284, 314 (1973) ("*Commentary*").[2]

Three years after the United States acceded to the Single Convention, Congress in 1970 enacted the Controlled Substances Act ("CSA"), 21 U.S.C. § 801 *et seq*., "a comprehensive statute designed to rationalize federal control of dangerous drugs." *Nat'l Org. for Reform of Marijuana Laws (NORML) v. DEA*, 559 F.2d 735, 737 (D.C. Cir. 1977). "[A] number of the provisions of [the CSA] reflect Congress' intent to comply with the obligations imposed by the Single Convention." *Control of Papaver Bracteatum*, 1 Op. O.L.C. 93, 95 (1977); *see, e.g*., 21 U.S.C. §§ 801(7), 811(d)(1), 958(a); *see also* S. Rep. No. 91-613, at 4 (1969) ("The United States has international commitments to help control the worldwide drug traffic. To honor those commitments, principally those established by the Single Convention on Narcotic Drugs of 1961, is clearly a Federal responsibility.").

The CSA imposes strict controls on marijuana, which is defined to include "all parts of the plant Cannabis sativa L." and all compounds and derivatives thereof, with certain exceptions not relevant here. 21 U.S.C. § 802(16). The statute classifies marijuana as a schedule I substance, the most stringent classification available, reflecting a determination that marijuana "has a high potential for abuse" and "no currently accepted medical use." 21 U.S.C. § 812(b); *see Craker v. DEA*, 714 F.3d 17, 19 (1st Cir. 2013); 21 C.F.R. § 1308.11. The CSA makes the unauthorized

---

[2] The United Nations' Economic and Social Council requested that the Secretary-General prepare the *Commentary* "in the light of the relevant conference proceedings and other material" in order to aid governments in applying the Single Convention. Economic and Social Council Resolution 1962/914(XXXIV)D (Aug. 3, 1962).

possession, manufacture, and distribution of marijuana a crime punishable by severe penalties. 21 U.S.C. §§ 841, 844.

Although federal law recognizes no currently accepted medical use for marijuana, *see United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 491 (2001), it does permit the cannabis plant to be cultivated lawfully for research purposes pursuant to a DEA license. *See* 21 U.S.C. §§ 822(a)(1), 823(a); 21 C.F.R. pt. 1301.[3] Since its founding in 1973, DEA has licensed only one such grower to supply researchers with marijuana—the National Center for Natural Products Research ("National Center"), a division of the University of Mississippi. *See* Lyle E. Craker, 74 Fed. Reg. at 2104; Applications To Manufacture Marijuana, 81 Fed. Reg. at 53,846. The National Center cultivates marijuana pursuant to a contract administered by NIDA. Besides overseeing the cultivation of marijuana, NIDA also plays a role in determining which researchers may obtain marijuana for medical or scientific use. *See* 21 U.S.C. § 823(f); Announcement of Revision to the Department of Health and Human Services Guidance on Procedures for the Provision of Marijuana for Medical Research as Published on May 21, 1999, 80 Fed. Reg. 35,960 (June 23, 2015).

The current contract between NIDA and the National Center, which became effective on March 23, 2015, provides that the National Center will, among other things, "cultivate and harvest, process, analyze, store, and distribute cannabis . . . for research." Award/Contract Issued by Nat'l Inst. on Drug Abuse, to the University of Mississippi, Contract No. HHSN271201500023C, at 4 (effective Mar. 23, 2015) ("2015 NIDA Contract"). The National Center must also "[p]rovide an adequate DEA approved storage facility" for the harvested cannabis and may ship it to researchers only "as required by NIDA." *Id.* at 17. All work under the contract is to be "monitored" by the Government Contracting Officer's Representative, an employee at NIDA's headquarters in Bethesda, Maryland. *Id.* at 16, 34. The contract requires the NIDA representative to monitor technical progress based on the National Center's monthly progress reports, to evaluate the National Center's work, to perform technical evaluations and inspections of a sample of the marijuana shipped to NIDA, and to assist in resolving technical problems. *Id.* at 17, 26, 34.

---

[3] Sections 822(a) and 823(a) vest authority over registration for such licenses in the Attorney General. Pursuant to 21 U.S.C. § 871(a), the Attorney General delegated this function to DEA. 28 C.F.R. § 0.100(b).

In 2016, in response to increasing public interest in marijuana research, DEA announced a new policy reflecting its intention to increase the number of federally authorized growers. *See* Applications To Manufacture Marijuana, 81 Fed. Reg. at 53,846–48. Under the new policy, a grower, if approved for a license, would "be permitted to operate independently, provided the grower agrees (through a written memorandum of agreement with DEA) that it will only distribute marijuana with prior, written approval from DEA." *Id.* at 53,848. NIDA would not be involved in monitoring the additional licensees. We understand that DEA has several currently pending requests from entities that seek to register as marijuana growers under that policy.

## II.

Under the CSA, DEA may register an applicant to cultivate marijuana only if the registration scheme is consistent with the Single Convention. We address whether DEA's practices and policy for licensing marijuana cultivation comply with the Single Convention and, if not, what changes DEA must make to conform to the treaty.

## A.

An international agreement has the force of domestic U.S. law if it is self-executing or if Congress has implemented it by legislation. *See Medellín v. Texas*, 552 U.S. 491, 504–05 (2008). Here, Congress has executed the Single Convention in the CSA. In that Act, Congress provided that the Attorney General "shall" license the cultivation of marijuana "if he determines that such registration is consistent with . . . United States obligations under international treaties, conventions, or protocols in effect on May 1, 1971." 21 U.S.C. § 823(a).[4] The Attorney General is thus required to determine that the licensing scheme is consistent with the Single Convention before exercising his authority to register an applicant to cultivate marijuana. *See Control of Papaver Bracteatum*, 1 Op. O.L.C. at 99; Memorandum for John E. Ingersoll, Director, Bureau of Narcotics and Dangerous Drugs, from Mary C. Lawton, Deputy Assistant Attorney General, Office of Legal Counsel, *Petition to Decontrol Marihuana—*

---

[4] The Single Convention was amended by a 1972 protocol, but the amendments are not material to the obligations discussed in this opinion. *See* Protocol Amending the Single Convention on Narcotic Drugs, Mar. 25, 1972, 26 U.S.T. 1439.

*Interpretation of Section 201 of the Controlled Substances Act of 1970*, at 4 (Aug. 21, 1972) ("[I]n making determinations as to the fitness of registrants to receive licenses for manufacture or export and import of controlled substances, the Attorney General is instructed to ensure consistency 'with United States obligations under international treaties.'").

Article 23(2) of the Single Convention, made applicable to marijuana cultivation by Article 28, contains five requirements for the supervision, licensing, and distribution of marijuana. *See* Single Convention art. 23(2)(a)–(e). Under current regulations and practice, DEA satisfies the first three requirements. The Convention specifies that the agency must designate the land on which cannabis cultivation is permitted, limit cultivators to those licensed by the agency, and specify the extent of the land on which cultivation is permitted. *Id*. art. 23(2)(a), (b), (c). Federal regulations implement those requirements by mandating that a marijuana manufacturer obtain a DEA license annually for each physical location at which marijuana is grown. 21 U.S.C. § 822(a)(1); 21 C.F.R §§ 1301.11(a), 1301.12(a). DEA establishes annual production quotas for lawful marijuana cultivation, and it has exercised that authority by setting the annual quotas for the National Center, the only entity ever registered by DEA to grow marijuana to supply researchers in the United States. 21 U.S.C. § 826; 21 C.F.R. § 1303.11. DEA has ample authority under this framework to specify the areas and circumstances under which a licensee may cultivate marijuana and in fact satisfies the first three requirements of Article 23(2) of the Single Convention in registering applicants under the CSA pursuant to those requirements.

Article 23 of the Single Convention also imposes control requirements beyond those currently carried out by DEA. Under Article 23(2)(d), "all cultivators shall be required to deliver their total crops" to the agency, and the agency "shall purchase and take physical possession of such crops as soon as possible, but not later than four months after the end of the harvest." Article 23(2)(e) requires the agency to "have the exclusive right of importing, exporting, wholesale trading and maintaining stocks." The United States currently attempts to comply with those requirements through NIDA's contract with the National Center, under which NIDA's contracting officials supervise the National Center's cultivation of marijuana and distribution of marijuana to researchers. Article 23's final requirement, however, provides that the "governmental functions" in Article 23(2) must be "discharged by a single government agency if the constitution of the Party concerned permits it." Single Convention art. 23(3).

We conclude that the existing licensing framework departs from Article 23 in three respects. First, the division of responsibilities between DEA and NIDA, a component of the Department of Health and Human Services ("HHS"), contravenes Article 23(2)'s requirement that all Article 23 functions be carried out by a single government agency. Second, neither of the two government agencies "take[s] physical possession" of the marijuana grown by the National Center, as required by Article 23(2)(d). Third, no federal agency exercises a monopoly over the wholesale trade in marijuana, as required by Article 23(2)(e). We discuss each departure in turn.

## 1.

Current practice diverges from the Single Convention's requirement that a single agency undertake each of the listed control functions unless the constitution of the treaty party forbids it. As explained, DEA is responsible for the controls required by Article 23(2)(a), (b), and (c) because it effectively designates the area where marijuana cultivation is permitted, limits cultivators to those licensed by the agency, and specifies the extent of the land on which cultivation is permitted. NIDA, for its part, attempts to satisfy the physical-possession and government-monopoly-control requirements of Article 23(2)(d) and (e) by supervising cultivation under its contract with the National Center. That division of authority is contrary to Article 23(3), because nothing in the Constitution would preclude the United States from discharging all of those controls through one government agency.

DEA agrees that "the United States fails to adhere strictly" to the single government agency provision because "both DEA and HHS carry out certain functions set forth in article 23, paragraph 2." Lyle E. Craker, PhD, 76 Fed. Reg. at 51,409.[5] For the current framework to be in compli-

---

[5] Members of Congress and the American Bar Association have also recognized that the division of regulatory responsibilities among federal agencies fails to comply with the Single Convention. *See* 129 Cong. Rec. 7434 (Mar. 24, 1983) (Rep. McKinney) (recognizing that the current division of responsibilities is in "violation of the [S]ingle [C]onvention" and introducing a bill that would create an "Office for the Supply of Internationally Controlled Drugs" within the Department of Health and Human Services to "comply[] with the [S]ingle [C]onvention on [N]arcotic [D]rugs"); *Report No. 1 of the Section of Administrative Law*, 109 Ann. Rep A.B.A. 447, 482 (1984) (noting that the Single Convention "requires that a *single* government agency license all domestic pro-

ance with the single-agency requirement of the treaty, we would have to view NIDA as performing the physical-possession and government-monopoly functions on behalf of DEA. *See* State Mem. at 5. But we do not believe that NIDA acts for DEA, and it is unlikely that DEA could lawfully supervise NIDA in the performance of its functions. We are aware of no statute that gives DEA that authority. And the President may not delegate to DEA his constitutional authority to supervise NIDA in the exercise of its statutory responsibilities. *See Centralizing Border Control Policy Under the Attorney General*, 26 Op. O.L.C. 22, 24–25 (2002).

## 2.

We turn next to the requirement that the single government agency "purchase and take physical possession" of the marijuana. Single Convention art. 23(2)(d). As noted above, NIDA contracts with, and partially oversees, the cultivation of marijuana by the National Center, which is licensed by DEA. But under that contractual arrangement, neither NIDA nor DEA takes physical possession of the marijuana. Rather, the National Center itself stores the marijuana on the premises of the University of Mississippi and ships it to researchers approved by DEA. Neither NIDA nor DEA accepts delivery of the harvested crops. That contractual arrangement does not satisfy the United States' obligations under Article 23(d). The contract at most results in a federal government agency's having constructive, rather than physical, possession of the marijuana crop.

## a.

The Single Convention does not define "physical possession." In construing that term we should "begin with the text of the treaty and the context in which the written words are used." *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1508–09 (2017) (internal quotation marks omitted); *see also Restatement (Third) of the Foreign Relations Law of the United States* § 325(1) (Am. Law Inst. 1987) ("*Restatement of Foreign Relations*") ("An international agreement is to be interpreted in good faith according to the ordinary meaning to be given to its terms in their context and in light of its object and purpose."); Vienna Convention on the Law of

---

duce[r]s of marijuana, specify the particular plots of land on which it is to be grown, and collect the crops of all domestic producers of marijuana" and that "at present the authority to control marijuana production is split between" government agencies).

Treaties art. 31(1), *opened for signature* May 23, 1969, 1155 U.N.T.S. 331("Vienna Convention") (similar).[6]

We think it evident from the treaty's text and context that "physical possession" requires growers licensed under the CSA to transfer the crops to the physical, and not merely legal, control of the federal government. Article 23(2)(d) says that "cultivators" must "deliver their total crops" to the government—a clear indication that the treaty contemplates the physical transfer of control from one party to another. The Single Convention's *Commentary* reinforces that point in emphasizing that "the time between the harvest and *delivery of the crop* should be as short as possible" and recommending that parties "set a final date after which possession of harvested [crops] by a private cultivator is in any event illegal and [the crop] subject to confiscation." *Commentary* at 283 (emphasis added). And this understanding of the words used in the Single Convention is further confirmed by the decisions of U.S. courts, which have consistently distinguished constructive possession from physical possession, with the latter requiring direct physical control over the item in question.[7]

One might argue that NIDA, through its contract, satisfies the treaty requirements of physical possession via the pervasive influence and control NIDA exercises over the National Center's cultivation operations. *See* State Mem. at 5; State Supp. Mem. at 2. NIDA's contract does provide that the National Center serves as "NIDA's cannabis drug repository." 2015 NIDA Contract at 16. DEA regulations also include detailed specifications for the material, size, and accessibility of the storage facility. *See* 21 C.F.R. §§ 1301.71–1301.76. The contract further specifies particular temperatures for the storage facility and notes that "[l]ocal DEA agents will determine the exact type of security required." 2015 NIDA

---

[6] The United States is not a party to the Vienna Convention, but this Office has relied on Article 31 as generally reflecting customary international law and practice. *See Interpretation of Article 17 Bis of the US-EU Air Transport Agreement*, 40 Op. O.L.C. __, at *5 (Apr. 14, 2016); *"Protected Person" Status in Occupied Iraq Under the Fourth Geneva Convention*, 28 Op. O.L.C. 35, 53 n.21 (2004).

[7] *See, e.g.*, *United States v. Hunter*, 558 F.3d 495, 503–04 (6th Cir. 2009) ("Actual possession exists when an individual knowingly has direct physical control over a thing at a given time[.]"); *United States v. Derose*, 74 F.3d 1177, 1185 (11th Cir. 1996) (defining "actual possession" as "physical possession or . . . actual personal dominion over the thing allegedly possessed"); *United States v. Raper*, 676 F.2d 841, 848 (D.C. Cir. 1982) (finding constructive possession even though the drugs were in another's "physical possession"); *United States v. Moreno*, 649 F.2d 309, 313 (5th Cir. Unit A June 1981) (same).

Contract at 17. And the contract provides for federal monitoring of compliance by the NIDA representative, although that supervision occurs primarily from NIDA's headquarters in Bethesda, Maryland. *Id*. at 16, 26, 34. But the control that NIDA exercises through these contractual provisions amounts at most to constructive possession of the marijuana, and is thus insufficient to meet the treaty requirement of physical possession by the federal government.

In particular, this requirement demands that the government have physical control over the crop. Because a government acts through its agents, that mandate means the marijuana must be delivered to government agents who must have personal and direct physical access to the crops in question, and not simply the ability or power to obtain access to them.

### b.

It could be argued that the National Center's employees are acting as federal government agents, and that the federal government physically possesses marijuana grown by the National Center through those employees. But in a similar context, for purposes of asking whether the federal government is liable for the actions of a contractor under the Federal Tort Claims Act, the Supreme Court has emphasized that requiring compliance with "federal standards and regulations" or contract terms that "fix specific and precise conditions to implement federal objectives" does not suffice to "convert the acts of [contractors] into federal governmental acts." *United States v. Orleans*, 425 U.S. 807, 815–16 (1976). A contractor's employees may become federal agents only if the government has the authority "to control the detailed physical performance of the contractor" and supervise its "day-to-day operations." *Id*. at 814–16 (internal quotation marks omitted).

For analogous reasons, the National Center's employees are not agents of the federal government. The parameters of the contract do not provide for DEA or NIDA to supervise closely the day-to-day physical operations of the National Center's distribution and storage functions. And the NIDA contract disavows the notion that it creates an agency relationship. It provides that the National Center operates "[i]ndependently, *and not as an agent* of the Government" and, further, that the National Center "shall be required to furnish all necessary services, qualified personnel, materials, equipment, and facilities, not otherwise provided by the Government." 2015 NIDA Contract at 15 (emphasis added). There is simply no indica-

tion that the federal government, rather than the National Center, exercises the kind of close supervision of the National Center's employees that would make them federal agents.

We are also not persuaded by a similar line of argument contending that the National Center "could be considered an extension of" the federal government. Applications To Manufacture Marijuana, 81 Fed. Reg. at 53,847. The suggestion is that the National Center itself operates as the federal government in carrying out the controls required by the Single Convention. The question of whether an entity is part of the federal government turns on a variety of factors, including whether the government owns the entity; whether the government appoints its officers and directors; whether Congress has defined its corporate purposes or appropriated funds for its operations; and whether the entity is controlled by or operates for the benefit of the federal government. *See Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 51–55 (2015); *United States v. New Mexico*, 455 U.S. 720, 739–40 (1982); Memorandum for Edward A. Frankle, General Counsel, National Aeronautics & Space Administration, from Randolph D. Moss, Assistant Attorney General, Office of Legal Counsel, *Re: Applicability of Government Corporation Control Act to Gain Sharing Benefit Agreement* at 7–9 (Sept. 18, 2000).

Under those factors, the National Center is not an extension of the federal government. The National Center is part of the University of Mississippi, located on campus in a university-owned building, and run by its own employees. It does not operate solely for a federal purpose, but instead was established to help the University conduct "research to discover and develop natural products for use as pharmaceuticals, dietary supplements and agrochemicals, and to understand the biological and chemical properties of medicinal plants." National Center for Natural Products Research, About NCNPR, https://pharmacy.olemiss.edu/ncnpr/about-ncnpr/ (last visited June 6, 2018). While the federal government pays the National Center to grow marijuana and exercises some supervision over its growing operations, the government does not generally fund or control the National Center. That the National Center may physically possess the marijuana it grows, then, does not satisfy the federal government's obligation to do so.[8]

---

[8] The Supreme Court has cautioned against applying "background principle[s] of American law" that are "relevant to the interpretation of federal statutes" but were not necessarily adopted by the signatories to a treaty (for example, the presumption in favor

### c.

In addition to taking "physical possession," Article 23(2)(d) requires that the national agency "purchase" the marijuana from the cultivator. That requirement provides for the government to pay for and take legal title to the marijuana. The *Commentary* advises that the payment of money was meant to encourage the delivery of the crops because "[p]rompt payment, a good price and other favourable conditions of purchase may be incentives to producers to deliver speedily their total" crops to the agency. *Commentary* at 283. The exchange of payment for the harvested crops encourages each grower to deliver its full inventory to the government.

Neither NIDA nor DEA "purchases" the harvested crops from the National Center, but it could be said that NIDA does not need to do so if it already has title to the marijuana. *See* State Mem. at 4–5; HHS Mem. at 5–6. Although the contract between NIDA and the National Center includes some provisions discussing government property, they do not expressly address or otherwise make clear where title to the marijuana crops lies.[9] But we need not decide whether NIDA has title to the crops. The requirement that the federal government physically possess the marijuana crops is distinct from the requirement that it "purchase" the crops and thus secure title. *See* Single Convention art. 23(d). Physical possession is not conferred by mere "transfer of title or risk of loss." *In re World Imports, Ltd.*, 862 F.3d 338, 344 (3d Cir. 2017) (interpreting the Bankruptcy Code's reference to "receipt of goods" as requiring "physical

---

of equitable tolling of federal statutes of limitations). *Lozano v. Montoya Alvarez*, 572 U.S. 1, 12 (2014). Here, we have sought help from analogies drawn from U.S. law to interpret the Single Convention "in good faith in accordance with the ordinary meaning to be given to its terms in their context and in light of its object and purpose." *Restatement of Foreign Relations* § 325(1).

[9] The current NIDA contract incorporates a clause of the Federal Acquisition Regulation dealing with government title to property. 2015 NIDA Contract at 55. That clause states that "[t]itle to property (and other tangible personal property) purchased with funds available for research and having a unit acquisition cost of less than $5,000 shall vest in the Contractor upon acquisition or as soon thereafter as feasible; provided that the Contractor obtained the Contracting Officer's approval before each acquisition." 48 C.F.R. § 52.245-1 Alternate II (2012). If the unit acquisition cost is $5,000 or more, title vests "as set forth in this contract." *Id*. The application of this clause to marijuana the contractor grows rather than purchases is ambiguous and the contract does not otherwise expressly address title to the crops.

possession"); *see Matter of Brio Petroleum, Inc*., 800 F.2d 469, 472 (5th Cir. 1986) (same); *Matter of Marin Oil, Inc*., 740 F.2d 220, 225 (3d Cir. 1984) (same). Moreover, DEA certainly does not have title to the crops. Even if NIDA had formal legal title to the crops, the current arrangement would still have to be adjusted to comply with the treaty's requirements that a single government agency be charged with licensing cultivators, purchasing, and physically possessing the crops. In the course of making those adjustments, DEA could enter into a contract that expressly states that it owns the marijuana crops, should the agency seek to obviate the need for a purchase and claim ownership in the marijuana from its inception, rather than buying back the crops shortly after the harvest.

### 3.

Finally, we do not believe that the current arrangement provides for the federal government to exercise "the exclusive right of importing, exporting, wholesale trading and maintaining stocks" in the drug, as required by Article 23(2)(e). DEA has authority to control the lawful distribution of the crops in certain respects. But just as with the physical possession requirement, the Single Convention contemplates that the government monopoly will involve more than the exercise of regulatory authority. The *Commentary* on the Convention stresses that wholesale trade "must be undertaken by governmental authorities," rather than private parties, because of the risk of diversion. *Commentary* at 278. The Convention contemplates an actual "monopoly," *id*. at 284, i.e., "[t]he market condition existing when only one economic entity produces a particular product or provides a particular service." *Black's Law Dictionary* 1160 (10th ed. 2014). The government agency responsible for the relevant controls must own the crops and be the sole distributor of the marijuana. In allowing the National Center to maintain possession of the marijuana and ship it to DEA-approved researchers, the NIDA contract does not create the required government monopoly over the lawful marijuana trade.[10]

---

[10] The government monopoly need not extend to "medicinal" marijuana. Single Convention art. 23(e). But that exception is not available under current federal law. As noted above, the federal government has not recognized any accepted medical use for marijuana. *See Oakland Cannabis Buyers' Co-op*., 532 U.S. at 491. As a result, "there is currently no such thing in the United States as 'medicinal cannabis'" for purposes of the Single Convention. Lyle E. Craker, 74 Fed. Reg. at 2116. Moreover, anyone who wished to produce medicinal marijuana or marijuana preparations would still be required to pur-

For the reasons discussed above, the National Center does not play the role of the government monopolist. *See supra* Part II.A.2.b. Indeed, that conclusion is buttressed here by a constitutional concern. If the National Center were viewed as exercising significant authority in establishing a federal government monopoly over the lawful distribution of marijuana, in conformity with the international obligations of the United States, its officials might be viewed as officers of the United States, who would need to be appointed consistent with the Appointments Clause. *See Ass'n of Am. Railroads*, 575 U.S. at 55–56; *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 87–93, 100–110, 121 (2007). If any National Center officials were officers of the United States, they would have to be appointed either by the President with the advice and consent of the Senate, or, pursuant to statutory authority, by a court of law, a department head, or the President alone. *See* U.S. Const. art. II, § 2, cl. 2. We are not aware that any National Center officials are so appointed, but because, as discussed above, we do not believe that the National Center is exercising the sovereign authority of the United States, such concerns do not arise.

## B.

Even if the current framework departs from Article 23, it would still comply with the Convention if it satisfied Article 39, which provides that, "[n]otwithstanding anything contained in this Convention, a Party shall not be, or be deemed to be, precluded from adopting measures of control more strict or severe than those provided by this Convention." We therefore must consider whether the NIDA contract system may be viewed as resulting in a "more strict or severe" system of controls than one where the government physically possesses the marijuana crops and monopolizes their distribution. *See* State Mem. at 4–6.

Article 39 permits a party to the Single Convention to impose substitute measures that result in tighter controls than those otherwise required. *See Commentary* at 449. But as the *Commentary* explains, such "substitute measures should *clearly* be 'more strict or severe' to prevent any . . . doubts" about their validity. *Id.* (emphasis added). As examples of "[p]ermissible substitute controls," the *Commentary* identifies "the prohibition

---

chase cannabis stocks from the national cannabis agency that purchases and takes physical possession of the marijuana crop grown by licensees. *See Commentary* at 284.

of manufacture of and trade in certain drugs instead of subjecting them to a system of licensing, or the imposition of the death penalty in place of 'imprisonment or other penalties of deprivation of liberty.'" *Id.* at 449–50.

The close regulation of the National Center is not clearly more strict or severe than the controls in Articles 23 and 28. The Office of the Legal Adviser points out that the NIDA contract, unlike the controls required by Article 23(2), addresses the risk of diversion during the cultivation process in addition to diversion that may occur after the crops are harvested. *See* State Mem. at 5; State Supp. Mem. at 1.[11] For example, the National Center must maintain its registration for working with scheduled drugs, 2015 NIDA Contract at 13, which requires certain security measures for manufacturing activities, *see, e.g.*, 21 C.F.R. § 1301.73(b) ("Manufacturing activities with controlled substances shall be conducted in an area or areas of clearly defined limited access which is under surveillance by an employee or employees designated in writing as responsible for the area.").

As effective as those contractually imposed diversion controls may be during marijuana *cultivation*, however, we cannot say that they clearly compensate for the absence of the required controls governing the *trade* in the crops, which the treaty drafters evidently believed posed greater risks of diversion. The controls required by Article 23 of the Single Convention reflect the specific concern that "experience has shown that permitting licensed private traders to purchase the crops results in diversion of large quantities of drugs into illicit channels." *Commentary* at 278. The treaty drafters thus concluded that "the acquisition of the crops and the wholesale and international trade in these agricultural products cannot be entrusted to private traders, but must be undertaken by governmental authorities in the producing countries." *Id*. The *Commentary* then explains that pursuant to Article 23 "[f]armers should be required to deliver the opium as soon as the Agency requests it, that is, is in a position to take physical possession of the crops of the cultivator concerned. . . . The Convention not only requires that the Agency should take physical possession of the

---

[11] The Office of the Legal Adviser suggests that DEA's framework is also stricter than required by the Single Convention because DEA establishes annual quotas for the National Center's marijuana production. *See* State Mem. at 1, 5. But those quotas not only indirectly implement the requirements in Article 23(2) for the national cannabis agency to designate the land on which cultivation is permitted, *see Commentary* at 281, but also directly implement Article 21 of the Convention, which requires parties to limit the annual quantity of drugs lawfully manufactured and imported. DEA's quotas are therefore not more strict or severe than the Single Convention otherwise requires.

opium, but also that it should 'purchase' it as soon as possible." *Id*. at 283. In other words, allowing the National Center, rather than the federal government, to distribute marijuana replicates in critical respects a system that the drafters rejected as inadequate, not one that they would have seen as "clearly more strict."

We also believe that reliance upon Article 39 here would be hard to reconcile with other provisions in the Single Convention that expressly provide parties with discretion to impose appropriate controls. For example, Article 28(3) gives parties discretion "to adopt such measures as may be necessary to prevent the misuse of, and illicit traffic in, the leaves of the cannabis plant."[12] *See also* Single Convention art. 2(8) (requiring parties to "use their best endeavours to apply . . . such measures of supervision as may be practicable" to substances that "may be used in the illicit manufacture of drugs"); *id*. art. 30(2)(b)(ii) (stating that parties should require that prescriptions for Schedule I drugs be written on official forms "[i]f the Parties deem these measures necessary or desirable"); *id*. art. 30(4) (stating that parties should require certain drug wrappings if the parties "consider[] such measure necessary or desirable"). Article 23 and the remaining provisions of Article 28, however, require a party to adopt very specific controls over the cultivation of marijuana (aside from the leaves of the plant) and do not give discretion to choose alternative means, simply because the party believes in good faith that the controls will accomplish the same purpose. Article 39 thus permits parties to depart from the specific controls mandated only where the alternatives are plainly more "strict or severe." The existing licensing scheme falls short of that standard.

## C.

In considering the appropriate interpretation of the Single Convention, we have reviewed the statements and practice of the International Narcotics Control Board ("INCB"), the international body established by the Single Convention to monitor treaty compliance, which we understand has not objected to the United States' licensing scheme. While the interpretation of a body charged with monitoring treaty implementation may

---

[12] As noted above, the Single Convention's definition of cannabis does not include the leaves when unaccompanied by the top of the plant. Single Convention art. 1(1)(b). The CSA's definition of marijuana, by contrast, includes the leaves. 21 U.S.C. § 802(16).

sometimes help in resolving ambiguities in the treaty's text, such views are not authoritative interpretations of the treaty or legally binding on the United States or other parties.[13]

Here, the INCB's failure to object reveals little. The INCB's mandate does not require it to note every instance of noncompliance. Rather, the INCB is charged with identifying situations in which the Convention's aims "are being seriously endangered by reason of the failure of any Party, country or territory to carry out [its] provisions." Single Convention art. 14(1)(a). In fulfilling this mandate, the INCB has, for example, objected to "the legalization of the production, sale and distribution of cannabis for non-medical and non-scientific purposes in the states of Alaska, Colorado, Oregon and Washington." 2014 INCB Report at 25. But the fact that the INCB has not objected to the federal licensing scheme does not mean that the INCB views that framework as complying with the Single Convention.

Indeed, the INCB's interpretation of the Single Convention appears entirely consistent with ours. For instance, the INCB's 2014 annual report advises that "States wishing to establish programmes for the use of cannabis for medical purposes that are consistent with the requirements of the Single Convention must establish a national cannabis agency to control, supervise and license the cultivation of cannabis crops." *Id.* at 35. The national cannabis agency must "purchase and tak[e] physical possession of crops" and maintain "the exclusive right of wholesale trading and maintaining stocks." *Id.* While the INCB has not expressly objected to the United States' licensing scheme, it has "note[d] that the control measures in place under many existing programmes in different countries fall short of the requirements set out above." *Id.* at 36. We do not infer from the INCB's silence any affirmative approval of the existing licensing scheme or the licensing schemes of other countries.

---

[13] *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 427–28 (1999) (guidance issued by the Office of the UN High Commissioner for Refugees regarding the interpretation of the Refugee Convention "may be a useful interpretative aid, but it is not binding on the Attorney General, the [Board of Immigration Appeals], or United States courts"); Observations of the United States of America on the Human Rights Committee's Draft General Comment 35: Article 9, *2014 Digest of United States Practice in International Law* ch. 6, § A(2)(b), at 179 ("The United States believes the views of the Committee should be carefully considered by the States Parties. Nevertheless, they are neither primary nor authoritative sources of law.").

## D.

We have also reviewed information about executive branch practice and the practice of other state parties to the Single Convention. As we have observed, the Executive Branch has long licensed the National Center to grow marijuana without having a single government agency purchase and take physical possession of the cannabis crops after harvest. A number of other state parties to the Single Convention apparently follow the U.S. practice. *See* State Mem. at 6–7; State Supp. Mem. at 3.

The practice of the Executive Branch and other state parties is relevant in treaty interpretation. Courts "find particularly persuasive a consistent pattern of Executive Branch interpretation, reflected in the application of the treaty by the Executive and the course of conduct of the parties in implementing the agreement." *Relevance of Senate Ratification History to Treaty Interpretation*, 11 Op. O.L.C. 28, 36 (1987) (citing *O'Connor v. United States*, 479 U.S. 27, 32–33 (1986)); *see also* Vienna Convention art. 31(3)(b) (noting that, "together with the context," treaty interpretation should take into account "[a]ny subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation"). The practices of a treaty's parties can also be useful evidence of the parties' "understanding of the agreement they signed." *United States v. Stuart*, 489 U.S. 353, 369 (1989); *see Medellín*, 552 U.S. at 507.

But as the Supreme Court has explained, "where the text [of a treaty] is clear . . . we have no power to insert an amendment." *Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 134 (1989) (holding that the text of the Warsaw Convention controlled where it could not "be dismissed as an obvious drafting error").[14] Here, Articles 23 and 28 clearly require that the United

---

[14] *See Water Splash*, 137 S. Ct. at 1511 ("[W]hen a treaty provision is ambiguous, the Court may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." (internal quotation marks omitted)); *Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 534–35 (1991) (explaining that treaty interpretation begins "with the text of the treaty and the context in which the written words are used," while "[o]ther general rules of construction may be brought to bear on difficult or ambiguous passages" (internal quotation marks omitted)); *United States v. Jeong*, 624 F.3d 706, 711 (5th Cir. 2010) ("Only if the language of a treaty, when read in the context of its structure and purpose, is ambiguous may we resort to extraneous information like the history of the treaty, the content of negotiations concerning the treaty, and the practical construction adopted by the contracting parties." (internal quotation

States have a single government agency "purchase and take physical possession of" lawfully grown cannabis crops "as soon as possible, but not later than four months after the end of the harvest," Single Convention art. 23(2)(d), and that this agency thereafter "have the exclusive right of importing, exporting, wholesale trading and maintaining stocks" of marijuana, *id.* art. 23(2)(e).

In addition to the fact that the Single Convention is unambiguous, state practice does not appear to reflect a conclusive or consistent interpretation of the controls required. *See* Memorandum for Edwin Meese, III, Attorney General, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re: Intent and Constitutionality of Legislation Prohibiting the Maintenance of an Office of the Palestine Liberation Organization in the United States* at 4 n.5 (Feb. 13, 1988) (declining to depart from the text of an international agreement based on inconclusive post-ratification practice). The Office of the Legal Adviser identifies Australia, Canada, Israel, and the United Kingdom as countries with similar licensing practices as the United States, in which the government agency does not purchase or take physical possession of the marijuana, but allows private growers to distribute it. State Supp. Mem. at 3. But the practices of a handful of the 186 parties to the treaty are entitled to comparatively little weight in illuminating the meaning of the treaty, and certainly do not supply the kind of subsequent practice that "establishes the agreement of the parties regarding its interpretation." Vienna Convention art. 31(3)(b).

In fact, the practice of parties regarding lawful marijuana cultivation is hardly unambiguous. In the Czech Republic, for example, the applicable legal regime requires licensed cannabis growers to "transfer cannabis grown and harvested . . . exclusively to the State Institute for Drug Control," which is instructed to "buy cannabis harvested within 4 months of its harvesting." On Dependency Producing Substances and on Amending Certain Other Acts, Act No. 167/1998 Coll. sec. 24b(1) (as amended). And a 2017 report on cannabis legislation in Europe states that in Italy, "[f]rom November 2015, the [Ministry of Health] can issue permits for

---

marks omitted)); *Avero Belgium Ins. v. American Airlines, Inc.*, 423 F.3d 73, 86 (2d Cir. 2005) (holding that secondary evidence of the parties' intent "may be useful where the intentions of the party States cannot be deduced by the treaty's plain language, but we need not rely upon such evidence here as the text of Montreal Protocol No. 4 is clear and, consequently, controlling" (internal citation omitted)).

cultivation" of cannabis and that "[l]icensed farmers deliver the cannabis to the ministry, which then allocates it for production." European Monitoring Centre for Drugs and Drug Addiction, *Cannabis Legislation in Europe: An Overview* 8 (2017).[15] Currently, it appears that the only authorized grower in Italy is the Italian Army, *see* Anna Momigliano, *In Italy, the Army Provides Medical Marijuana. And Some Say That's a Problem*, Wash. Post, Dec. 1, 2017, which would suggest that a single Italian government agency has physical possession of the crop and a monopoly on trade in cannabis, as the text of Articles 23 and 28 requires. There is also evidence that other parties to the Single Convention have established a single government agency to administer the controls required by Articles 23 and 28. *See, e.g.*, *Narcotic Drugs Act 1967*, Act No. 53/1967 (Cth) ch 2 pt 2 (as amended) (Austl.) (establishing marijuana licensing framework operated by the Department of Health); Report of the International Narcotics Control Board for 2005, at 16 (Mar. 1, 2006) (noting that "since the last report of the Board was published, the Government of the United Kingdom has established a national cannabis agency"); David Mansfield, *An Analysis of Licit Opium Poppy Cultivation: India and Turkey* 10–17 (Apr. 2001) (describing the regulation of opium in Turkey under the Grain Marketing Board and in India under the Central Bureau for Narcotics).

We find relevant as well the practice of countries that license private growers to cultivate the opium poppy and the coca leaf—both of which are subject to the same Article 23 regime as the cannabis plant.[16] The practice among countries that permit lawful production of those plants is consistent with the text of Article 23. In India, Turkey, and Peru, for

---

[15] The report also describes the Netherlands' regime for medicinal cannabis, which provides that cannabis producers may be "licenced by the Dutch government and must sell all produce to the [Office of Medicinal Cannabis], which then distributes it to pharmacies." *Cannabis Legislation in Europe: An Overview* at 7. Although this regime appears to comply with the text of the Single Convention, the Netherlands has a separate regime for non-medical cannabis, pursuant to which it licenses coffee shops to sell small quantities of cannabis. The INCB has objected to this practice and noted that it "is in contravention of the provisions of the [Single] Convention." Report of the International Narcotics Control Board for 2001, at 35 (Feb. 27, 2002).

[16] Article 26 provides that Article 23 applies to licit cultivation of the coca leaf except that the government agency is not required to take physical possession of the crops within four months, but only "as soon as possible after the end of the harvest." Single Convention art. 26(1).

example, a government agency purchases and takes physical possession of those crops following the harvest.[17]

The Office of the Legal Adviser suggests that state practice with regard to opium may not be instructive as to marijuana because "[t]he vulnerabilities of the two plants" to diversion "are significantly different" owing to their different properties. State Mem. at 6. But the Single Convention's drafters recognized that "the conditions under which the cannabis plant is cultivated for the production of drugs are very different from those under which the opium poppy is grown for opium," and nonetheless "provide[d] the same regime for both, namely that of article 23." *Commentary* at 313.[18]

While state practice is therefore inconclusive, the Single Convention's drafting history would strongly support our interpretation of the text of Articles 23 and 28 even if the treaty were ambiguous. *See Water Splash*, 137 S. Ct. at 1511. An earlier draft of the Single Convention would have provided a less-stringent regime for cannabis than applicable to the coca leaf, under which a closely regulated private entity could grow marijuana. Under that draft, a "'licensed scientific institute'" would have been permitted to "'produce, manufacture, possess and export under close State supervision to the government of another Party small amounts of cannabis . . . for the purpose of scientific research.'" Memorandum for Malcolm R. Wilkey, Assistant Attorney General, Criminal Division, from Robert Kramer, Assistant Attorney General, Office of Legal Counsel, *Re: Constitutionality of Legislation to Carry Out Certain Provisions of Draft Single Convention on Narcotic Drugs* at 2–3 n.2 (Jan. 20, 1960) (quoting Article 39 of draft Single Convention). With regard to the coca leaf, however, the draft would have provided for the Article 23 system of controls. *See id.*

---

[17] *See* Central Bureau of Narcotics, Licit Cultivation, http://www.cbn.nic.in/html/operationscbn.htm (last visited June 6, 2018) (explaining that licensed opium cultivators in India "are required to tender their entire produce to the Government"); Mansfield, *An Analysis of Licit Opium Poppy Cultivation* at 10–12 (describing the licensing and control measures for opium cultivation in Turkey, overseen by the Grain Marketing Board, which takes physical possession of crops); United Nations Office on Drugs and Crime, *Peru Coca Cultivation Survey* 8 (June 2005) (explaining that the National Coca Enterprise ("ENACO") "has a monopoly on the commercialization and industrialization of the coca leaves," such that "the selling of coca leaves to any party other than ENACO is considered illicit by national law").

[18] Indeed, the *Commentary* suggests that the regime for opium could, "in practice," prove to be inadequate to control cannabis production. *Commentary* at 313 n.9.

at 1–2 n.1 (quoting Article 36 of draft Single Convention). In other words, the Single Convention's drafters considered, but rejected, allowing licensed private institutions to produce, store, and ship marijuana under close government supervision, and instead adopted a requirement that the government take physical possession of the crop and conduct trade in the drug. That history also shows that the drafters of the Single Convention considered applying less-stringent controls to marijuana, but declined to do so and instead applied the same stringent controls to marijuana, opium, and the coca leaf.

## III.

For similar reasons, DEA's 2016 policy statement also fails to establish a framework that would fully comply with Articles 23 and 28 of the Single Convention.

Under that policy, DEA would allow a licensee "to operate independently" of NIDA, "provided the grower agrees (through a written memorandum of agreement with DEA) that it will only distribute marijuana with prior, written approval from DEA." Applications To Manufacture Marijuana, 81 Fed. Reg. at 53,848. Such a licensee would also "be subject to all applicable requirements of the CSA and DEA regulations, including those relating to quotas, record keeping, order forms, security, and diversion control." *Id*. DEA suggests that these requirements would be consistent with the purposes of Articles 23 and 28 of the Single Convention because these requirements "will succeed in avoiding one of the scenarios the treaty is designed to prevent: Private parties trading in marijuana outside the supervision or direction of the federal government." *Id*.

While DEA focuses on its view of the broader purposes of the treaty's requirements, the Single Convention requires the United States to adopt specific, listed controls if it licenses cannabis cultivation. A single government agency must purchase and take physical possession of harvested cannabis, and generally monopolize the wholesale trade in that plant. The United States cannot satisfy those requirements simply by employing alternatives that the government believes may prevent unlawful diversion. As we have explained, Articles 23 and 28 certainly could have given the parties the discretion to determine the particular controls necessary. Rather than take that route, the parties to the treaty agreed to certain specific controls, and Congress has required the Attorney General to apply those strictures when granting licenses under the CSA. Accord-

ingly, DEA's licensing procedures must comply with those choices. DEA's announced policy, however, would not comply with Articles 23 and 28 of the Single Convention.

## IV.

We conclude that DEA must alter the marijuana licensing framework to comply with the Single Convention. DEA has discretion to develop a regulatory framework that meets the requirements of Articles 23 and 28. In doing so, DEA need not rule out a regime in which DEA purchases or takes legal title to the marijuana plants prior to their cultivation; adopts a system of regulation and day-to-day supervision that would create an agency relationship; or relies upon NIDA's expertise to assist the agency in its functions. At a minimum, however, this licensing framework must provide for a system in which DEA or its legal agent has physical possession and ownership over the cultivated marijuana and assumes control of the distribution of marijuana no later than four months after harvesting.

In justifying the current licensing framework, DEA had concluded that the division of labor with NIDA was "a result of the existing statutes, regulations, and Congressional appropriations," and declined to opine on whether, absent legislation, DEA could carry out all the functions required by the Single Convention. Lyle E. Craker, PhD, 76 Fed. Reg. at 51,409–10. Having examined DEA's and NIDA's authorities, we do not believe that further legislation is required for DEA to perform those functions. DEA has statutory authority to do so pursuant to 21 U.S.C. § 823(a), which obliges DEA (by delegation from the Attorney General) to ensure that registrations for the manufacture of marijuana comply with the Single Convention. That language authorizes DEA to take steps reasonably necessary to ensure that the registration scheme complies with the Single Convention, which as we have said clearly contemplates that a single government agency will purchase and take physical possession of marijuana crops from registrants. The statute thus authorizes DEA to perform the control functions contemplated by the Single Convention, including the functions of purchasing (or otherwise securing title over) and taking physical possession of marijuana crops. Reading the statute otherwise would preclude DEA from registering any marijuana manufacturer because no registration could be in compliance with the Single Convention, contrary to Congress's evident intent that DEA administer the registration system. Congress has also established a fund for DEA's

diversion control program, which includes DEA activities "related to the *registration* and control of the manufacture, distribution, [and] dispensing . . . of controlled substances." 21 U.S.C. § 886a(2)(B) (emphasis added). Because Congress has made compliance with the Single Convention a necessary condition of registration, *id*. § 823(a), that fund may be used in purchasing, storing, and monopolizing the wholesale trade in marijuana. And although HHS has statutory authority to "determine the qualifications and competency" of the *researchers* who seek to purchase marijuana from licensed growers to conduct research, *id*. § 823(f), that provision would not bar DEA from establishing a government monopoly from which those researchers could purchase marijuana.

The NIDA contract is a longstanding feature of the marijuana licensing scheme, and the current version of that contract is annually renewable through March 2020. 2015 NIDA Contract at 27. Although DEA must discharge the obligations required by Article 23(2), NIDA may still play a significant role. The relevant statutes require that "[r]egistration applications by practitioners wishing to conduct research with controlled substances in schedule I shall be referred to the Secretary [of Health and Human Services], who shall determine the qualifications and competency of each practitioner requesting registration, as well as the merits of the research protocol." 21 U.S.C. § 823(f). The Single Convention does not require that a single government agency be charged with all responsibilities related to marijuana, and the congressional decision to delegate those responsibilities to HHS is consistent with the Single Convention. Aside from carrying out its role under section 823(f), NIDA may continue to exercise some supervision over certain aspects of the marijuana cultivation, and DEA may consult NIDA in the process. We see no reason why the NIDA contract framework might not remain in place under a system in which DEA assumes clear title to the marijuana, either at inception or by purchase after harvest, and then takes physical possession after harvest. For instance, DEA could station one or more employees at the National Center after cultivation as a way of ensuring physical possession of the marijuana and exclusive control over its distribution.

We would be pleased to advise on these or any other matters concerning implementation of a new licensing framework.

HENRY C. WHITAKER
*Deputy Assistant Attorney General*
*Office of Legal Counsel*